Good morning, ladies and gentlemen. Our first case for this morning will be Panther Brands v. Indy Racing League. Mr. Fisher? Your Honors, I think it would be useful for the Court to have an understanding of the rather unusual business model of IndyCar racing. It is not like most sports, and it's relevant to the issues that the Court has determined in this case. I would be happy for you to talk about that, but maybe it would be better to start with the jurisdictional questions that we have. Certainly. Did you in particular want to talk about the Westfall Act or the federal officer or federal question? You can take them both. Why don't you take them in that order? Sure, because the question I have about the Westfall Act is what happens when an amended complaint is filed that doesn't include the United States at all, or the officer? Well, that's a good question. We have cited cases to the Court which held that there are two relevant time periods for assessing jurisdiction. One is the time that the case is removed to federal court, and the other is the time that the Court takes the action appealed from, which in this case was the dismissal of the case. At neither of those occasions was the United States a party to the lawsuit. The case was not removed under the Westfall Act, nor was it removed by the United States. It was removed on federal question and federal officer allegations by DOCUPAC. The U.S. intervened and substituted itself for the individual guardsman defendant who we promptly dismissed for that reason, quite obviously. That was some seven or eight months before the Court then dismissed the amended complaint, which contained no allegations against the United States. We interpret the cases as requiring that the United States be a party at one of those two relevant time periods. That is, the date of removal or the date of the judgment appealed from, and it was not a party as to either of those. So what you're seeking is a dismissal for want of federal jurisdiction? Yes, Your Honor. All right, so their argument to the contrary is that once jurisdiction attaches under the Westfall Act, it's then in federal court and we're under, say, the more discretionary supplemental jurisdiction kinds of doctrines for whether it should stay there. Well, there are two responses to that. With respect to discretionary, we think it's an abuse of discretion if there are no federal issues, no governmental defendant, a series of state law claims, and in particular state law. Well, that happens all the time under 1367C. It's not an absolute rule. It happens sometimes that all federal issues are gone from a case and the Court chooses to retain jurisdiction, but it's unusual for it to happen at this very early stage of litigation, when there is no federal issue or federal basis of jurisdiction, but the Court at the motion to dismiss stage, before there's even been discovery, decides to rule on issues of law and only state law that are applicable at the time, including making what it purports to be some new decisions of Indiana law concerning the scope of the Indiana tort of unfair competition. I'm not sure that there's never been a case that was accepted once jurisdiction was gone this early in the proceeding, but we cited a number of cases which suggest strongly that the Court, if not obligated to at least in the exercise of reasonable discretion, should send a matter back to state court if it involves only state law issues at an early stage of the proceeding. Okay, and as to federal officer, did you have any additional comments to make? I think the brief's pretty self-explanatory on that. We don't think DOCUPAC qualifies under that doctrine. Any comments on the bearing of our recent decision about that subject in Liu Junhong? I'm sorry, I'm not familiar with that. Yes, well, that's one of the troubles. Neither side seems to be familiar with any case on this issue within the past decade. There are several, including one by the Supreme Court that neither side discusses. Your Honor, if I could go back to the question of the business model. Before you get to it, let me ask you one question. So if I understand your answers to Judge Wood, was there proper West Falls certification after removal? Is that your position? There was a certification by the Attorney General that would permit the United States to substitute. At that time it was proper, correct? At that time it was proper for, if the United States had stayed in, there would have been jurisdiction, if that's the question that you're asking. I'm asking when there was West Falls, the West Falls certification occurred, was that proper at that time? I'm not sure that that's the case. And the reason I'm not sure that's the case is because it wasn't removed on the basis of the West Falls Act. So when the United States was added, there was no jurisdiction over the United States because there had never been a Tort Claims Act notice filed. So there was still no subject matter jurisdiction over the United States at that time. People file federal Tort Claims Act suits all the time without having exhausted their administrative remedies. There's no doubt that the Court has jurisdiction to deny those claims for lack of exhaustion. Is it your view that exhaustion is a part of subject matter jurisdiction? We cited a number of cases which indicated that there was no subject matter jurisdiction when there had been no Tort Claims Act notice filed at all. But those cases on the whole were decided before the Supreme Court has cautioned all of us to be much more careful about our use of the term subject matter jurisdiction. And I believe it's more recent cases certainly would show that if somebody timely moves to dismiss based on failure to exhaust, that motion should be granted if that's what the facts show. So that's, it's not that there's no remedy for failure to exhaust, but it doesn't affect the Court's power over the case. I agree with that, Your Honor. So there is subject matter jurisdiction. There was subject matter jurisdiction for, or there would have been had the United States been substituted. Rather than substituting, we chose to dismiss the individual for whom they were substituting. So there was never a time when the United States was actually a party, and certainly there was never a party to the amended complaint that was the complaint that was dismissed. Okay, did you have any other questions? All right, I mean, as far as moving for the time being to the merits, you can talk about the structure of the industry if you want, but I have to tell you my real concern is with parts of the contract that you didn't cite. For example, 4.5 in which Panther Brands acknowledges that the relationship with IndyCar is nonexclusive in all respects, that IndyCar shall have the right to seek and can enter into sponsorship relationships with third parties, et cetera, et cetera. And there are a number of others that your opponents cite also that appear to be more specific on this point than the Section 9.15 that you're relying on. I disagree that they're more specific. I think they are more general, but I think they are reconcilable in any event. We're not claiming that we had an exclusive right to fan zone access. IndyCar was allowed to grant access to fan zone to other people. But it doesn't say anything about fan zone in 9.15. No, but it does. It talks about sponsorship agreements. Yes, Your Honor. Which strikes me as perhaps a different subject. Sponsorship agreement is this document. It is so labeled the sponsorship agreement, and repeatedly that phrase is used to refer to this document and the package of promotional and marketing benefits that is provided by IndyCar. One of those is the fan zone access, but it's not the only one. But it doesn't say that in Section 9.15. It just says no sponsorship agreements with certain clients. They're listed. The National Guard is one of them, and agents are included. I see that in it. I just am having trouble reconciling the different parts of the contract under your reading. Are you saying that some of these other sections were simply superseded and should have been X'd out? No, of course not. We have focused on fan zone because that is a specific, unique item with respect to the promotional opportunities that were offered to the Guard because it was specified as being a requirement in the 2014 bid document. The sponsorship agreement is the method by which IndyCar gives a whole package of rights and benefits that it owns. Some of those are exclusive. Others aren't. You could go to other sources, for example, to buy tickets to the race. So the fact that you get tickets as part of your sponsorship agreement, there are other sources for that. This agreement provides that a sponsorship agreement, by which it means the package of documents or package of rights and privileges granted by IndyCar or sold by IndyCar to race teams for their sponsors, won't be available to specific named clients of Panther. But how do you reconcile that with the language that IndyCar is not prohibited from entering into agreements with other race teams, such as the one here, this R-L-L-R or Rahal Letterman team, to use the Fan Village space? Because the use, it could. It could enter into an agreement with R-L-L to rent its space in Fan Village, just not for a prohibited use. Now I don't understand at all what you mean. Why else would you rent it to R-L-L? Well, R-L-L could have put a David Letterman exhibit in there. They could have solicited another sponsor by offering to put an exhibit for that sponsor in there. The issue here, the prohibition here, was on providing these sponsorship benefits to a specific client. The benefits themselves are non-exclusive and R-L-L or anyone else could have purchased them for any clients other than those on the list of expressly forbidden individuals or companies for which they could act. Exclusive doesn't, non-exclusive isn't the same thing as public. Something can be non-exclusive and be quite restricted in terms of what people can have access to and what people cannot. There is nothing inconsistent about saying that, to use the example of Fan Zone, the right to Fan Zone access isn't exclusive, which means that you can't bar everybody else from Fan Zone. It's non-exclusive because IndyCar intends to lease space there to other people, but it expressly agreed not to lease space there to a specific small group of listed individuals. That's not inconsistent. Okay, so your whole argument hinges on understanding IndyCar's prohibition on sponsorship agreements to cover these particular benefits that you're talking about. To cover the package of benefits. Agreement, is that a defined term? Yes, it is actually. If you'll look at page 114 of the separate appendix of the plaintiffs, this is a part of the document. This is the license agreement section of it, and you will see in the second paragraph the preliminary statement. You see that on the second sentence, or second line, it describes this agreement as being the sponsorship agreement. That's what this document refers to. But in context, it's also clear that sponsorship agreement is talking about this group or this set of packages that is offered every year by IndyCar for purchase by its race teams to provide to the race team's sponsor. At the very least, I don't think it's ambiguous. I think it's clear that that's what it refers to. At the very least, you're arguing about possibility of an ambiguity that should not be resolved on a motion to dismiss. But you pointed to no extrinsic evidence we should look at. The district court realized that this was a contract, had to resolve what did the contract mean. You only get into extrinsic evidence in juries when we know that there's some out there. Well, we don't have to establish all of what the evidence is before we conduct any discovery. What about any of it? I mean, I don't know. Well, this is a negotiated contract. It was written by people. Those people can be deposed and asked, what did you mean by the term? But you didn't do that. You didn't say. We couldn't say what those depositions were going to reveal, or those emails were going to show, because discovery was stayed, and we weren't permitted to get them. Well, but you haven't suggested what, you haven't proffered anything. You haven't suggested what extrinsic evidence would help disambiguate if this is ambiguous. I'm not sure it is, but if it were, what would that evidence be? That evidence would be the intent of the parties and the use of the term sponsorship agreement. If that's ambiguous, if it could mean something other than this document and this package of benefits, then we're entitled to discovery and to a ruling on the merits, not a ruling on a motion to dismiss. If we can't do discovery. But it didn't enter into a sponsorship agreement with the National Guard, Lincoln Tech, Drash, TriWest, Oracle, or Emergent. It entered into an agreement with RLL. We don't know that. We know it was there. You said they did. We know it entered into an agreement, and our understanding is, either with DocuPack directly or with the joint venture of DocuPack and RLL. But clearly it entered into a contract with an agent to provide it with the space that it needed or that it wanted for the display that Panther had created to be used by the Guard after Panther's sponsorship agreement was terminated. Why isn't National Guard a client of RLL or somehow RLL and DocuPack? I mean, it's an odd usage that you're suggesting. They were your client. It says they will not enter into this agreement for the benefit of sponsors listed with agencies or companies representing such sponsors. Right, right. DocuPack's clearly one of them. We don't believe that it makes any sense to say, well, while DocuPack can't enter into this contract for the benefit of the Guard, DocuPack can say to RLL, you entered into this contract, then you assign that contract to us, and then we will give that contract to the National Guard. They're simply doing through an agent what they're expressly prohibited from doing directly. We haven't been able to get the actual agreement. We think it might be directly with DocuPack. What we know is that DocuPack and RLL submitted a joint bid saying that between them, the two of them were going to supply the benefits requested by the Guard in their bid proposal or bid package. We don't know which one of them ultimately ended up being the direct contract with IndyCar, maybe both, but in any event, it makes a sham and nonsense of this contract to say that DocuPack can't enter into this contract with IndyCar unless they hire somebody to enter into it and then assign it to them, and then they take it back to the National Guard. Okay. If you want to save a little bit of rebuttal time. Okay. All right. Are you Mr. Chafek? How do you pronounce your name? That's correct, Your Honor. I think that's probably the third time in my life anyone's ever done that right for the first time. Thank you. Good morning, Your Honors. May it please the Court. My name is Charles Chafek, and I represent Rahal Letterman Lanigan Racing. I've been designated to address any jurisdictional issues before the Court, and then will yield the remainder of my time to Ms. Krahulik, who will address the contractual issues. Well, I have a problem with your federal officer jurisdictional basis in light of the Liu Zhonghong decision, which Judge Easterbrook has already referred. There's an extensive discussion in that opinion, which is not a year old, right? I'm trying to think when that came out, about federal officer removal in particular and what it takes to be a federal officer, and I don't think much of the discussion is favorable to you. You have to be more than just regulated. You have to be more than playing a role under a regulatory structure to be a federal officer. Your Honor, I think that on this issue, the GAO decision would provide guidance to the Court. What decision? The GAO decision, Judge Easterbrook, where Panther had gone before the GAO protesting the bid that was awarded to Rahal Letterman-Lanigan. If you're not prepared to discuss Liu Zhonghong, perhaps you're prepared to discuss Watson against Philip Morris. That's the Supreme Court's decision, and it's more recent than anything cited in your brief. If Watson, Your Honor, stands for the proposition that when looking at the second element of a federal officer removal, which is acting under the supposed office, they define that as, and I quote, and this comes from the Watson case, to assist and help carry out the federal superior's duties or tasks. And if you look at the GAO decision, Judge Easterbrook, you will see that DOCUPAC, at the direction and control of the National Guard, went out, solicited bids, took in the bids, summarized those bids, and then provided them to the National Guard for purposes of making an ultimate determination. Well, I'll tell you what was going on in Liu Zhonghong. It has to do with private companies performing tasks required by the FAA's regulatory jurisdiction, and the argument was made that somebody had to do it, and the FAA would have had to hire its own people to do it if Boeing hadn't handled this. And we rejected that out of just quite decisively. So, you know, yes, DOCUPAC was performing tasks that the Guard wanted to have performed, perhaps as a contractor, perhaps, you know, in some other capacity. They don't seem to be employees. But I'm not sure that that's enough. You're citing this very broad rule where a federal government uses a private corporation to achieve an end that it would have otherwise used its own agents to complete, and we said that rule is too broad. I would agree with you, Judge, that merely delegating to a civilian company certain ministerial tasks to accomplish the goal. These weren't ministerial tasks in Liu Zhonghong. They were not remotely ministerial, not remotely.  Is there any argument in this case that DOCUPAC was making final decisions on behalf of the Army? No. All right. Well, under Liu Zhonghong, I think that's the end of that theory of federal jurisdiction. Even if, Your Honor, It really is necessary to be aware of this circuit's controlling authority when you come to argue here. I say this to both sides. I would respectfully disagree that Liu Zhonghong is No. Let me finish. That's quite extraordinary. Let me finish, please. I was going to say that I would respectfully disagree that Liu Zhonghong is the beginning and end of this analysis. What I was going to say is Do you know what we held in that case? If you don't, how can you say that it's not dispositive? I wasn't going to say that, Your Honor. What I was going to say is that DOCUPAC in this case did exercise discretion in the form of making summaries. Bowling exercise discretion. We held in Liu Zhonghong that that was not sufficient. So maybe you should turn to your Westfall Act argument and perhaps go to the general line of questioning that Judge Bruce was suggesting. You know, when exactly the United States certified, when the amended complaint comes in, what its effect is. You had started out by asking what happens when a matter is certified by the attorney general and then an amended complaint is filed and the United States is dropped. I believe that that question is squarely answered by the Supreme Court case of Osborne and subsequently by the district court in the Fourth Circuit, the Kamesh case. They held that once a certification occurs, it, quote, quote, forecloses any jurisdictional inquiry. And that jurisdictional inquiry being foreclosed is based on Any jurisdictional inquiry about what, concretely? Any jurisdictional inquiry about the propriety of that case remaining in federal court. About the propriety of the certification, about whether the U.S. should be substituted for the worker, about maybe the scope of employment. But once the Army employee and the United States are gone from the case, how does that affect subject matter jurisdiction about everybody else? The act itself, the Westfall Act, would say that regardless of what happens after the certification occurs, that removal would be mandatory. And I realize there wasn't. There was no Westfall Act removal here. I understand. And then the second component is that the case permanently remains in the federal court. And that's the product of the policy. Well, you don't mean it remains in federal court until the end of the universe. It remains in federal court until the end of the claim against the United States. What we need to know is what happens to everybody else when the claim against the United States is gone. The cases that you're citing don't address that question because it didn't arise in those cases. So we need to figure out what the answer is, and we can't find the answer in cases that don't discuss it. So what is the answer? I would respectfully submit, Judge, that the case should remain in federal court to promote the policy underlying the Westfall Act, which is to prevent anti-shuttling. It's a one-way street. Once it goes up from state court into federal court, it's supposed to remain there. And the Osborne case talks about that. That I don't understand at all. There are ample doctrines, including 1367, which say that when a federal issue is resolved, the case pretty much presumptively returns to state court. One can exercise supplemental jurisdiction, and maybe the Westfall Act claim is enough of a hook to exercise supplemental jurisdiction. But the argument that the district court must decide state law issues that have nothing to do with the United States when the United States is gone seems to me like a claim that the Westfall Act repealed 1367C, and that doesn't seem plausible, does it? I don't think that it does, Your Honor. What I would suggest, though, is that in this particular case, when the government, the Attorney General, made the certification and the United States was substituted in, Panther then withdrew its motion to remand at that point, filed an amended complaint dropping Yes, you argue in your brief that Panther is a stop from denying federal jurisdiction. But you surely know the rule. Even if Panther had filed, and the parties had filed a joint stipulation for federal jurisdiction, it would be ineffectual. We have to determine federal jurisdiction without regard to what the parties do or say or want or desire or waive. I absolutely agree with you, Your Honor. Your brief contends the opposite. There's no such concept in federal practice as being a stop to deny federal jurisdiction. No such thing. And the problem that I have is that there are different ways in which the federal issue can disappear from the case. One of them might be a 12B6 ruling. One of them might be a dismissal for lack of exhaustion. There are a number of different things that can happen. But the general rule is that when an amended complaint is filed and it changes either legal theories or parties, the amended complaint, for all purposes, supersedes whatever went before. There is no case anymore being brought against another party. And regardless of, you know, what's been said in cases that didn't really confront this, this wasn't a Westfall Act removal. It was a federal officer removal. It gets to the federal court somehow. And then you have a situation where there's no claim against the United States. You just have non-diverse parties, right? That's correct, Judge. But I don't think there's any denying that once the certification was filed and we were in front of the federal court with the United States as a party, the case was properly in federal court. And it wasn't until three weeks later that the amended complaint was filed, dropping the United States. Right, and that's the time I'm focusing on. Three weeks later, there is no case that involves the United States pending in the federal district court. I also don't think there's any denying that at that point, the court could have exercised supplemental jurisdiction over those remaining state law claims. Why? Pursuant to its statutory powers to exercise jurisdiction over the state law claims since the case was properly in federal court at that point. Well, you're depending on a theory that the governing complaint is the one that was abandoned. No, I'm relying on... Yes, you are. Because the complaint that drops the United States doesn't have anything that the supplemental jurisdiction can tag on to. But it wasn't the complaint itself that I would submit was the reason for the jurisdiction. It was the substitution of the United States in as a party. The substitution of the United States for a party named in the original complaint, and then the amended complaint removes both that party and the U.S. The U.S. is not a party to this litigation, as evidenced by the fact that the United States has not filed a brief. It doesn't think it's a party. I agree. The United States was dropped. But during that interim when it was a party and before the filing of the amended complaint, the case was properly in federal court. I don't think there's any dispute about that. Even the appellant concedes that. No, what we're trying to discuss is the implication of the fact that that time came to an end with the filing of the amended complaint. That's the focus. I'm not all that worried about what happened for whatever number of weeks it was when the complaint did name this Army National Guard person, the United States, Mr. Meltzer, and the United States was substituted. We're familiar with the way the Westfall Act works. Let me ask you a related question. How much time did Panther have to file a notice of appeal? Thirty days. Well, the rule says that if the United States is a party, it has 60 days. Your view seems to be that once the United States is a party, it's always a party. So your answer, 30 days, is incompatible with your basic position on federal jurisdiction. Your Honor, I'm not saying that the United States was always a party. What I'd like to point out is that there are often cases where a case gets into federal court properly, federal jurisdiction, and then for some reason that federal jurisdiction drops off. District courts are then allowed to exercise supplemental jurisdiction. And I'm just saying that those, I think the kinds of cases you're describing, are cases in which the federal claim drops out for some other reason other than the fact that there's just no complaint with a federal claim in it. As I said, a 12B6 is summary judgment, judgment under Rule 37B, dismissing a case. I can imagine all kinds of ways you'd get rid of the federal claim, at which point we have a discretionary matter before us. 1367C says if this happens really early in the case, then presumptively you get rid of the federal case and let the state courts do their business. If a huge amount has been invested, I mean, you know all of this. So there may be legal significance in the way the federal claim disappeared. Okay, but I was unable to locate any authority that would suggest that because it was a party in this case that was dropped that provided the basis for federal jurisdiction, that the court was then prohibited from exercising supplemental jurisdiction over the remaining state law claims. And the point I would like to make is that if you don't, as an appellant or a party below, ask the court to exercise its supplemental jurisdiction, you waive that on appeal. And so here I think we can say that because the court still had the ability to exercise supplemental jurisdiction, it was appropriate to render a decision, as the court did, and dismiss the case. I noticed that my time is expiring. Okay, I think unless there are further questions. I just want to make sure I understand that. So your position is basically the Westfall certification or whoever the United States arrived in the case, that acted as an anchor to keep the case in federal court. Is that what you're saying? Correct. That's correct. We're asking what happened afterwards. That anchored it there no matter what. Yes, that's correct. Judge Easterbrook, the last case I would point out is one that you decided. It's the Daniels case from 2007. No, counsel. Decisions are rendered by the court, not by the particular author. You authored the decision. No. My apologies. Decisions are rendered by the court. So the court's decision in Daniels. I quote here, Judge Easterbrook, Congress had a rational basis for providing that litigation be resolved in federal court once the Attorney General concludes, correctly or not, that the defendant acted within the scope of federal employment. And I would respectfully submit that that applies, even after a plaintiff dismisses out the federal office. Thank you. All right. Thank you very much. We will now hear from Ms. Krahulik. Good morning. The main point with the contract, and the one that Panther chooses to ignore throughout this case, is that the contract contains a specific provision related to the Fan Village. That is Section 4.6 of the contract. It is nearly two pages long. But in essence, Section 4.6, which is entitled Fan Village, says that what Panther got, with regard to the Fan Village specifically, was a limited, non-transferable, and non-exclusive license. In addition, it goes on to say that Panther could not convey, or that the license didn't create or convey any legal title, leasehold, or other legal, equitable, or beneficial property interests in that license space to Panther. And it also said that Panther is not allowed to sub-license, assign, sell, or otherwise transfer that license that's granted under 4.6. And while the court is well aware of principles of contract construction, I think emphasizing the one that says where a specific provision of a contract is in place, as opposed to a more general provision, the specific provision controls. And that's the case with Fan Village access here. So what's your reading of 9.15 that gives it any force within the contract? 9.15 was inserted in the contract for one purpose, and that was to prevent IndyCar from taking as its own sponsors, Panther Brand's sponsors, the named ones that were there. What do you mean by its own sponsors? To prevent those particular companies from becoming IndyCar partners, from paying money to be in a sponsorship arrangement with IndyCar. And IndyCar, there's no evidence in the record that it ever entered into such an agreement. So why does the existence of a number of intermediaries between, for instance, the National Guard and IndyCar make a difference? It seems like it's a pretty toothless provision if you just have to insert a few entities. It really doesn't because the Fan Village provision would control. But in any event, we're not talking about a sponsorship between IndyCar and any of those entities. Oh, but National Guard was using the Indy event as a big recruiting opportunity. It was paying money for that. I mean, you know, I guess maybe we're talking about definitions, but it does seem to me that it was serving as a sponsor of the IndyCar events. And actually in 2013, vis-à-vis this sponsorship agreement, the National Guard was named as a promotional partner of IndyCar. They had the ability to use one another's marks and to mutually hold one another out as being in a relationship. That wasn't the case thereafter. And that's what section 9.15 was intended to prevent IndyCar from taking away Panther's sponsors as its own sponsors. So the IndyCar series presented by the National Guard. And that was the meaning of it. 4.6 specifically deals with Fan Village access. 9.15 was inserted out of fear that because of those relationships that were being formed at the track every weekend, they might go away from race teams entirely and go to IndyCar as their venue or their vehicle of sponsoring racing. Does Ray Hall Racing then have something similar like a Ray Hall Brands that's similar to Panther Brands? It's not in the record, and I'm not aware that they do. So how often does IndyCar enter into direct sponsorship agreements as opposed to these sponsorship opportunities with the various competitive teams that we're looking at? The vast majority of IndyCar's contracts are direct sponsorship agreements. This was a little bit different of a situation just because Panther Brands was representing all of its clients and seeking opportunities in the Fan Village for them. Typically, the Fan Village space is for IndyCar sponsors. Because these sponsors were important to a race team, IndyCar entered into this agreement. I take it from all of this fuss that the Fan Village space is a finite resource, that there are only so many slots, whether they're hexagonal in shape or whether they're rectangular or whatever they may be. Exactly, and the reason for that is because at each venue, the promoter for that race sets aside a particular amount of space for the Fan Village. It is a coveted space, but it's a license. IndyCar gets to decide who's in there, and Fan Village, as set forth in 4.6, it's simply a license. You're allowed to be in there. It's not transferable. The district court pointed out that courts generally disfavor restraints on trade and the ability to enter into contracts. It's kind of ironic. That's what Panther is doing here to its opponent or its competitor. Courts say stuff like that all the time, but they're not thinking about what contracts really are and what restraints of trade are. Even what IndyCar is doing is a restraint in the sense that they're exercising the right to dictate who gets to go into their space. Most of us might say that certain restraints are quite reasonable, but I know courts say these things. Yes, except for the fact that IndyCar is paying for that space through its agreement with the promoters, and then it can license it to whoever it wishes to utilize it. So you're just saying that you don't think that 9.15 is IndyCar's particular agreement not to exercise that exclusivity right vis-à-vis these specified named clients of Panther? No, I actually think 9.15 doesn't deal with Fan Village at all. 9.15 says IndyCar is not going to steal your sponsors, Panther, and take them as their own and have an agreement just like this with them. What about Mr. Fisher's argument, though, that it talks about sponsorship agreements, which are comprehensive documents that have lots of different opportunities in them? Yeah, and a sponsorship agreement is mutually beneficial. There's intellectual property rights. There's all sorts of two-way rights between the parties. The actual deliverables are, for lack of a better term, items that are sold, and they can be sold under a sponsorship agreement or separately. They're not the sponsorship agreement. The sponsorship agreement is the relationship that's created, and this 2013 contract created a promotional partner relationship between IndyCar and the National Guard and a sponsorship agreement between Panther Brands and IndyCar. So it's a completely separate thing, and again, in any event, 4.6 controls when we want to talk about Fan Village. And all of the claims here center on Panther's assertion that it had the exclusive right to provide Fan Village space to the National Guard in 2014. So 4.6 and 9.15, if interpreted as Panther asserts, are in conflict in the specific provision as to Fan Village space being a mere license, expired at the end of 2013, and should control. So we aren't really talking about anything beyond Fan Village here? Well, no. All of the claims center on Panther's assertion that Rahal Letterman or anyone else could not provide that deliverable that was specified by the National Guard for its 2014 bids for its sponsorship. And without that being true, all of the claims fail. And 4.6, for some reason, Panther never really addresses 4.6 and doesn't talk about how that could possibly exist in harmony with 9.15 under their interpretation of 9.15. The court looked at a bunch of different things, but also mentioned the rule, the district court mentioned the rule that where the exhibits and the complaint are in conflict, the exhibits trump. And here, the contract clearly, in great detail, talks about the Fan Village and the rights thereto. And it trumps any contrary allegations in the amended complaint. Okay. Thank you very much. Anything further, Mr. Fisher? Your Honor, if we'd been permitted discovery and permitted to offer evidence in this case, one of the things that we would have shown is that the language of 4.6, indeed the language of most of this sponsorship agreement, came first. It was a proposal that was given to us, to Panther, by IndyCar. The negotiated term, the added term, was 9.15. That was what was put onto this to make it clear that we would be able to have this exclusive right. 4.6 doesn't support the defendants, I believe it supports us, because it contains within it the same kinds of exclusive provisions that we then supplemented by adding 9.15. You will see in 4.6, for example, that while Panther leases it, it says it may be utilized by Panther only on behalf of the National Guard. The same kind of restriction that we added later on for our benefit. At the end of that provision of 4.6, it says IndyCar agrees that National Guard shall be the sole U.S. Armed Forces division to be displayed in the Fan Village during the term. A specific provision excluding the Navy, excluding the Air Force, excluding other branches of the service from this space. It's the same kind of agreement that we then negotiated in 9.15 to protect our interest in providing the National Guard with this product. The other thing that I'd like to address is the comment that was made that if this contract is held not to be enforceable, then all of Panther's claims fail. They're ignoring the claim of commercial bribery in this case. It has nothing to do with whether or not that provision is true or not. We believe that Indiana recognizes commercial bribery as a cause of action. The court rejected it based upon its interpretation of Indiana law as limiting unfair competition solely to the bribery of an employee or a former employee for its trade secret information or the passing off of goods as your own. There's no Indiana case that asserts such a limitation, and there are Indiana cases that specifically talk about commercial bribery and approve that as a cause of action. So independent of the interpretation of the contract, this case shouldn't have been dismissed. It should have gone to trial on the issue of commercial bribery, and if a very restrictive view of Indiana law was to be applied by the court, it should have been applied by a state court, not by a federal court. All right. Thank you very much, Mr. Fisher. Thanks to all counsel. We'll take the case under advisement.